May it please the Court, my name is Leslie Rice-Melman, and I represent the Federal Trade Commission in this appeal. What's at issue in this appeal, Your Honors, is a modern-day but particularly aggressive version of the bait-and-switch schemes that courts in the Commission have long condemned. At the merits phase on the Commission's motion for summary judgment, the District Court, applying this Court's prior precedence, properly considered the net impression of defendants' representations that were made in a series of phone calls to consumers who were busy in their workplace, and concluded that it was self-evident that those calls were both deceptive and that the following collection calls and letters were both deceptive and abusive. Can I ask you, let's assume that's all been established. The issue here is the amount of the monetary award. Are you saying that the District Judge had no discretion at all, that he had to award the full cost of what you call the loss to the consumer, although that's a presumption, that he had no discretion in this matter? No, Your Honor. The Commission is not saying that at all. The Commission recognizes that the Court does have discretion in considering the monetary relief. But the the Go ahead. I'm sorry. I was going to ask you. You can follow up when you finish your thought. What relief did you want from us exactly? But finish your thought, if you remember. I'm sorry. Well, the problem came in at the second stage of the proceedings, where it's the Commission's position that having established widespread deceptive practices, that it was then incumbent on defendants to come back and demonstrate that there was some subset of consumers who, in fact, understood the terms of the transaction. Defendants attempted to do this primarily by presenting the testimony not of an expert in consumer perception, but an economist who then deconstructed in a laboratory, effectively deconstructed an entire multi-step course of dealing that took place between the defendants and consumers. He threw out completely the very important first contact with consumers, the representation that if you participate in this survey, you'll get a free gift. That's a very the first contact, as we've learned in our prior cases, is very important. That's what catches the consumer's eye, and that's what affects everything that happens subsequent in this entire course of dealing. And it was a bait and switch, and it was designed to get people who were busy doing other things. It was all not a nice picture, but the question I have is, do we reverse with instructions to enter a judgment for $34 million, if we agree with you, or do we remand it to the district court for consideration? What other factors can you consider? I notice you say in your brief that you would agree, if I read it correctly, that the accepting arguendo of PBS's theory that customers who chose to open more than one account were not deceived, revenue attributable to one-time only customers was $15 million. So if I understand it, if you took off the number of people who actually went ahead and chose to open more than one account, you would reduce that $34 million to something like $19 million. Well, Your Honor, it's the commission's position that the deception was pervasive. There is evidence in the record as to consumers who opened up multiple accounts. However, there's also evidence in the record that those... A lot. It's $15 million is a lot of money. If we – if the district court were to – the district court granted the commission $191,000, it completely... Well, the commission didn't offer many alternatives. The commission asked for it all. The commission... The commission didn't present any expert testimony that tried to whittle that down in the slightest. So, frankly, I can feel the frustration of the district judge being told, I got this alternative and this alternative, or else they want me to construct my own calculation. I don't believe this one. This is the only other game in town. Well, I have two responses to that, Your Honor. First of all, the commission did present alternatives to the district court. There were – there was evidence that came in as to the consumers who had more than one account. And the district court, although the commission doesn't agree with it because we believe that some of the same tactics were applied to those consumers, and there's evidence in the record... Okay. Well, let's focus on that because it interests me. The – I don't know its reliability, but at least defendants assert that 53 percent of its revenue comes from customers who either renewed or added on. Why should it be assumed that somebody who's done a transaction and decides to renew it doesn't understand what the transaction entails? They may have been gotten into it. Like many sales pitches, they attract their interest. But by that point, they surely understand what the transaction entails, and then they renew. Well, in fact, the evidence shows there were consumers who got into those multiple transactions. Some of them called just to make – because they were being pushed to make a payment on an account that they didn't believe they had consented to and felt under pressure. And then they were told, oh, well, you can – you're now going to get a free gift. And so it was another form of the same scam that affected the majority of consumers. Did the customers testify that fit that description? When I looked, I only found a handful of customers who actually testified. The district court would not allow – would not allow the commission to, in the second stage of the proceedings, to put on more than I think it was – it was four consumers. And some of those did have – did have the extra accounts. And the extracts of the – that the commission obtained from the defendants that came in, I believe, through an FTC analyst, Mark Lupino, showed that there were consumers who had been signed up for as many as 600 years of subscriptions, and yet the actual extracts showed that they were calling and complaining. So there's a lot of evidence throughout the record that consumers ended up with extra accounts. Now, the district court did not take the commission down to the $15 million had it omitted all those customers with extra accounts. Instead, it took the commission down to $191,000, which is what Dr. Duncan believed after he basically chopped up the entire course of dealing. The commission present alternatives. Well, at that point, the burden had switched to the defendants to show why – I didn't hear an answer to my question there. Did the commission present alternatives? Well, one alternative was that the commission presented before the district court was to eliminate those consumers who had extra accounts. And that was something that the district court could have considered but didn't. Another alternative that – Well, can we – you still haven't answered my second question. What do you want in remand? Can we remand to the district court to say, if we agreed with you, you've applied the wrong standard that standard is not the profit to the defendant. Here's what the rules are. Do it again. Or do you want a judgment – you want us to direct a reversal with the directions to enter a judgment for $34 million? Yes, that is what the commission would prefer. Which is yes to what? Yes, the commission would prefer this court to remand to the district court with instructions to enter a judgment for $34.4 million. The commission would like to be able to restore to those consumers who were deceived their losses. And that is an important role that this court – Even though revenue attributable to one-time only customers was $15 million. Well, the commission believes that the record shows that the customers who had multiple accounts were tricked into multiple accounts. It's hard to imagine – Did the district court make a finding of that? No, the district court did not even consider that. The district court simply adopted the very erroneous approach of Dr. Duncan, who basically threw out – Well, without such a finding, how could we – why would we want to remand for the full $34 million when the damages – let's say these are astronomical figures, and I don't know what they're capable of paying, but when the real damages might have been $15 million, real loss to the consumer. Well, the – Revenue attributable to one-time only customers was $15 million. And there's no finding, one way or another, to support your claim, well, it doesn't matter. Why shouldn't there be a remand to determine whether it does matter for a finding of fact? Well, the commission believes that the record is not amenable to such a finding, and as – What does that mean, it's not amenable to such a finding? You've made a charge. You said they tricked people even into renewing, they did the same thing. I mean, they – But the district court hadn't made any finding that would justify that. So I don't know what you mean. Well, they – because they tricked people into getting the new additional accounts – subsequent purchases. So if there's no finding to that effect, why would we remand it with directions to give $34 million instead of $15 million? Well, I mean, the – For example. The – there would have to be a redress plan prepared, and it's highly unlikely that – consumers certainly are not going to get a windfall. They would get up to what they have – what they have paid. I mean, if this – On what basis could the district court award $34 million if there has been no finding that all of the consumers, including the renewables and add-ons, were duped? I think what we're asking is doesn't there need to be a factual determination to that effect? The district court did find in summary judgment that there was – did not – there was repeated misconduct over a period of time, and that finding in summary judgment stands. Yeah, but we're talking – for example, I just picked this out as an example. I didn't make a finding that would justify that everyone who chose to open more than one account was deceived. There was no finding. If without a finding, what you have attributable to one-time only customers was $15 million, and that's much lower than 34, and it might even suggest an argument that maybe it was wrong to find that – to engage in a presumption, but the presumption that all were deceived. Well, but that's – What you're – which is what you're relying on. But, Your Honor, that summary judgment ruling stands – stands on appeal. Effectively, what the district court is – That's a finding of liability. It's not a finding of causation or damages. What – and there is no finding. Have a look. I can't find anything that supports award of everything. I mean, I can be defrauded and yet know exactly what I'm doing. I once bought a stock I didn't mean to buy, and it turned out to be very successful. I wasn't damaged. And in the end, they knew what I was doing. In this kind of a case, Your Honor, the – once there's been – there has been a showing of widespread deception, and this comes right out of this Court's decision in Figge, the – there's a presumption that arises that there is a – It's a rebuttable presumption. It is, yes. And if you have somebody who is renewed a subscription, doesn't that at least start to rebut the presumption that the person didn't know what he was doing? Now, you can argue that there is evidence that supports the proposition that we're still being pressured into things, but I don't see anything what the district court has entered that supports that proposition as a finding. I mean, that's a blank slate. But Your Honor, the defendants didn't even undertake to rebut that presumption. Let's look specifically. When they argue that 53 percent of the revenue comes from renewals and add-ons, doesn't that at least begin to rebut the presumption? Because if somebody has done it once and decides to renew, can it be assumed they knew what they were doing? Now, there may be misconduct. They might have been pressured into the renewal. But if they've done it once, at least they know what they did, and if they sign up to do it again, I'm not sure you can say that the strong-arm tactics at the beginning necessarily dictate what they do on renewal. Well, I mean, they might have argued that, but, Your Honor, it was incumbent on them to put on at that point some evidence. There was a burn switching to put on some evidence. They've got an expert report that says exactly that. It was admitted into evidence. Doesn't that start to rebut the presumption? And what did the government say in response? The expert report took a different approach and looked at the 53 percent number. I just read from the expert report. That's where the 53 percent number comes from. Now, it's stated in a conclusory fashion, but that's not entirely inconsistent with the numbers that Judge Corman read with regard to how much revenue, the $15 million, came from the multiple account people. So that starts to rebut the presumption. Well, Your Honor, it might start to rebut the presumption, but that was the defendant still didn't point to any set of consumers, didn't they put on four consumers at the evidentiary? Renewals. Renewals. Right. They did not. Isn't that the case that if somebody renews, they're doing something again? They've already done it once. They presumably know what they did the first time. Well, they – but they – there were consumers who really didn't understand fully the terms of the transaction. They've already done it. They've already paid for it. What's not to understand? There were lots of consumers, and this is – this has come through very clearly in the record. There were consumers who were trapped by these very egregious and abusive collection tactics. And a lot of consumers who were maybe somewhat less sophisticated, not good advocates for themselves, and they felt, I'm stuck. And they paid because they were threatened in many cases, not only for their credit rating, but they were threatened with being turned in for fraud. They were threatened with garnishment. These are very egregious collection tactics. And so a lot of them went and paid as they could, and then they – Signed up for more subscriptions. Unfortunately, it got offers for thank-you subscriptions and later found out that these thank-you subscriptions for making a payment that they were being pressured into making was that the defendants had opened up yet another order. There was one person I recall who had 600 – I think about 640 years of orders. That could only happen if there is deceptive and fraudulent conduct. Could I ask you a couple of practical questions? Do you have to collect $34 million? Are they capable of paying this judgment? Well, at this point, we – the commission doesn't have an asset freeze, so we do not know exactly what the assets are. We would have to – that would come in with post-judgment discovery. But the commission is committed to locating and returning, if possible, to consumers what they have lost. Now, the district court did note that this was impossible, and there's nothing in the record to show that it would be impossible to return money to consumers. And what would happen if it turned out that you couldn't return all the $34 million? If you could not return the money to consumers, it would have to be paid into Treasury. And that would – it would look more like a disgorgement case. At this point, defendants have – the commission is left with simply a – with a simple prohibitive injunction, $191,000, which is not – Well, again, maybe you're entitled to more. My question was, you want an actual remand for the full $34 million, and I asked whether you would – whether or not that was the appropriate remedy or whether it should go back to the district court for reconsideration, telling him that he's not limited – it was wrong just to look to loss of profits, but that there were other factors that he should have considered. You would object to that kind of a remand? That is certainly something this court would be within this court's ample discretion to do that. In that case, the commission would request that it go back to the district court with very clear instructions as to the proper procedures and – that would guide the district court on remand. I believe I'm – We've taken you over time. I'm way over my time. I'll still give you a minute for rebuttal. Thank you, Your Honor. Before we start the clock, let me ask, is there an understanding as to who's going to speak on behalf of the defendants collectively, or is the time going to be divided, or what's the approach? There are both of those, Your Honor. Jeffrey Willis on behalf of the corporate defendants and the individual defendants appellees are represented by Mr. Peter Homer. Also at council table is my colleague Brian Reed. And we intend to allocate, if possible, a time of 12 to the corporate defendants and 3 to the individuals. The clock will show the total time, but we'll be mindful of that. Thank you, Your Honor. Could I ask the practical question of you? If you pay a $34 million judgment, are you in bankruptcy? What is the status of your company? The corporate defendants are defunct. The individual – the two individual defendants that were named in the judgment, Mr. Edward Dantema and his son, Dries Dantema. Mr. Dries Dantema is now working for the TSA in a regional airport in Florida. And Mr. Ed Dantema suffers from a severe dementia and is, I believe, about 84 years old. And, no, there is no – there are no assets available to pay $34.4 million or anything close to that. Well, why can't this – if that's true, if you could satisfy the FTC on this, why can't this be settled? That is a question, Your Honor, that we have posed on many occasions in many contexts. It can't be settled because the FTC has refused to accept anything below $33 million, which they consider to be a discount from the $34.4. So you would object to mediation that would go to the issue of the amount of money in a case where he says the two corporate entities are defunct and that nothing close to $34 million can ever be collected, particularly if he was satisfied in that. Can I ask you, then? I am – this is the first that I've heard of any discussions like this. This case has gone on for some years, and – You know, I'm a district judge. We always look to settle cases. Well, the Commission would want to know what happened to all the money, and so – Well, they – I think they – I think there's an – I think I read in one of the briefs that after overhead and taxes and all the rest, they were left with a profit of something like $600,000. I don't know if it's true or not.  On the assumption that the corporate entities were defunct and that you couldn't come close to collecting what you're asking for, would you be opposed to mediation? That's all. That's not binding. I mean, you know, you could only say, well, mediation didn't work out. I'm not authorized to accept that. I've looked at the – I've had an accountant look at the financials, and a lot of the profit has been reduced in a way that hasn't been explained, and it's quite common in these cases to see not much profit because it has been paid off to those who might be colleagues of a defendant who's engaged in deceptive conduct. So I simply could not accept the case value. I'm not asking you – my preface was assuming you were satisfied that these – let's say the corporate entities were defunct. What's the point? There are – the commission has asked for all the individuals to – But what if it was true that the individuals didn't have the money either? I mean, isn't there some rational way to resolve this, short of just litigating and litigating? I mean, that's something that possibly after resolution of the appeal that the commission could possibly explore. Or we would have to have complete financials and see where the money went. It might have gone to third parties who have accepted that money and are holding it. This comes up all the time, Your Honor, in our crime cases and our deception cases. So the commission certainly is not prepared to accept at face value at this point in the proceedings the representation that the defendants cannot pay what we believe is the judgment that the commission was entitled to. I'm sorry. No, it's a subject that – I'll make an observation. I can't help but think that a lot of effort is being spent on a fight that in the end is not going to produce a reward justifying the amount of money spent on the fight. And that's intended for both sides. I mean, somebody is paying some very capable lawyers on behalf of defendants. Some money is being spent there out of whatever pot they have. I don't know TSA salaries were so good as to be able to pay for the quality of defense counsel. And so it's not like there is an entirely empty pot. On the other hand, the government is pursuing $34 million in circumstances where it seems highly unlikely that $34 million is out there. The facts of life here is that magazine subscriptions cost money. And so the net return to the defendants was something less than $34 million. And after that, I'll shrug my shoulders, Hollywood accounting is what it is. And creative bookkeeping can produce modest profits when, in fact, there was a lot of money. But the amount of money isn't going to be $34 million. So I'd suggest you're all very capable outside the context of this argument. You might well want to consider, and the panel will consider, the possibility of referring this case to the mediators. That's voluntary. If it doesn't work, it doesn't work. But it seems to me that proposing to send this case back to Judge Crowe will not make his day and won't make any of your days either. So I urge both sides. I'm not asking for a response now, but I urge both sides to consider doing this sooner rather than later. Now that we've eaten into your time, we can start the clock again and let you proceed with the argument. Thank you, Your Honor. As the panel has surmised, the FTC is seeking a reversal of a very hardworking, determined, dedicated district court judge who made the findings that complete justice in this case was the payment of $190,000, which, by the way, the judgment hasn't assessed. Let's get serious about that. I mean, the expert report that produced that number assumed the only injured parties were those that spoke up about it. Isn't that pretty much what led to the first the $60-some-thousand and then the $190-some-thousand? Your Honor, no. That is not what the expert report said. The expert report took three avenues. One of those was how many dollars can be attributed to people who actually complained. That was the $61,000. The middle or second point that Dr. Duncan derived was how many consumers or customers could be fairly said did not understand the terms of the arrangement before they parted with money. That's what the $191,000 represents. And then Dr. Duncan calculated EBITDA or gross profits, I guess we net profits, which were the $698,000 that Judge Corman noted. That's what Dr. Duncan did. Now, there is the second step loses legally, doesn't it? I mean, the fact that by the end of the sales pitch, facts may have been communicated such that you suddenly found out that you're going to be in the hook for X amount of money. But in a context when you're being told that's an obligation, not an option, not an invitation, just the whole scheme doesn't permit the inference that the expert report seems to depend upon because the calls weren't made to people saying, okay, here are these subscriptions, here's the cost. Decide. The calls were made to people in such a fashion that they were left to believe they had already decided, that they'd assumed this obligation. And by the time the facts, even accepting the premise of the expert report, by the time the facts were communicated, it's sort of like the horse is out of the barn. If you could stand up and say, well, no, that's not what I meant, okay. Some people have the backbone to do that. Some people just hang up. But other people think, gee, I'm obligated to do this. There's a missing piece to that, Your Honor, and that is the fact that during those phone calls, there was no request for money, none whatsoever. And within ten days of that phone call, the customer received a written form detailing all of the terms, providing the payment information, providing the methods of payment that could be made. And it wasn't until those written documents were received by the customer that any payments were submitted, and they were submitted voluntarily in response to those written orders. Voluntarily? Yes, sir. Were they told, you don't have to do this? This is all fresh now. You can decide for yourself when you want to do this. Or isn't the train already moving down the tracks as far as some of them are concerned? The train may already be moving down the tracks to some degree, Your Honor. But let's go back and look at what was determined to be a Section 5 violation. Wasn't there something in between? Wasn't there a verification call? There was. There were two phone calls. One was the lead call in which the initial solicitation was made and in which Judge Pro determined were Section 5 violations, self-evident Section 5 violations. Then, and that call was twofold. One was from the lead and then there was a verification. Later there was a verification, I'm sorry, a supervisor. Then there was a verification call within a day or so in which the verifier went through all of the terms, invited the consumer customer to ask questions, and confirmed the arrangement. Now, at that point in time, I believe that the declination rate during the verification call was close to 50 percent. So it's clear that at that point that the consumers were understanding what the deal was. Some of them, at least 50 percent. Well, at least 53 percent. That's correct, Your Honor. But we have to focus on what the Section 5 violations were. What Judge, in the lead call, what Judge Pro determined was is that these were self-evidently possible to mislead the consumer into thinking they were going to get something for free. Now, a consumer thinking they're going to get something for free is not going to pay money. They're going to say, sorry, that's not the deal. I'm hanging up. So it's the causal connection, the link between the Section 5 violation and the actual payment of money. Well, it's plainly not true. I mean, the whole point of your client's setup was to get people in the door with the notion they're going to get something for free. And then they're not told, oh, by the way, it's not free. We're charging you. They're told, you can help out by bearing the cost of us getting this to you in such a way that, yes, there's a cost, but it's meant to be sort of like the shipping and handling charges on anything you buy that suddenly that's where all the profit comes from. So to tell me that, okay, they knew it wasn't free, they're going to have to part with some money, but the impression being left is still, this is a great deal. We're giving you something and you're helping us out with the mailing. I can't characterize that as a voluntary transaction. Can you? I can certainly characterize the transaction as informed and voluntary at the time the consumer put their signature on a check or gave a credit card number. Absolutely. The district court made two findings in granting the preliminary injunction. He said, undisputed facts show that in the course of telemarketing magazine subscriptions, the defendants engaged in a pattern and practice of making material misrepresentations to customers to trick customers into believing they had entered into enforceable contracts in which they agreed to pay the defendants hundreds of dollars for non-cancellable long-term subscriptions. And then he went on to say, undisputed facts show that in the course of telemarketing magazine subscriptions, the defendants engaged in a pattern and practice of making abusive and harassing telephone calls to scare customers into paying them hundreds of thousands of dollars for non-cancellable long-term magazine subscriptions. Your Honor, thank you for bringing that up. He did make those findings in a summary judgment order. They were based upon declarations submitted by the FTC from consumers, most of whom never paid a dime. At the trial on damages, we introduced evidence from the company demonstrating, and it was not challenged, that the company policy was that collectors would not make abusive calls. They would not tell customers their contracts couldn't be canceled. They would never threaten lawsuits. They never threatened Better Business Bureau or credit rating, to report people to credit rating agencies. And that what you have in the first instance are the declarations from these FTC witnesses that were outliers, and their declarations for purposes of determining causation between the Section 5 violation and the payment of money was rebutted. And none of the testimony and evidence that was offered before Judge Proh on those subjects was challenged. So he may have found that at the outset to determine liability and to determine that injunctive relief was appropriate, but he said specifically in his order granting summary judgment that I don't have defined monetary damage. And monetary relief was appropriate, too. The only question was how much. Are you saying that these findings are not the law of the case, that they could somehow be they just evaporate in the monetary trial? I'm saying that those are findings related to the determination of liability, and the rest of the opinion knows that. And no appeal from that. That's correct. That's correct, Your Honor. But they still have to establish the causal connection between the Section 5 violation and the payment of money. And to do that, they claim to be It says it. It says that, for example, defendants engage in a pattern and practice of making abusive and harassing calls to scare customers into paying them hundreds of thousands of dollars for non-cancellable long-term magazine subscriptions. That's a finding. Agreed, Your Honor. I agree that that's a finding. It was, again, based on two or three declarations from the FTC, and that, of course, people who were unlocatable and were not cross-examined. And the evidence at trial, when it came time to determine the appropriate equitable monetary relief. I don't want to use up your time because we're getting away from what the main issue here is, but you could have introduced evidence. We did, Your Honor. We introduced evidence of the patterns and practices of the company. And he rejected it, and he made these findings. It's the law of the case. You didn't appeal. And now you're saying that your expert, for example, could ignore them both in making his evaluation that you only have to pay $191,000. Well, it's not quite that simple, Your Honor. We also established that the collection practices that Judge Proe determined were Section 5 violations produced little, if any, money. The Bob Callahan letter, after 7 months, the testimony, again, was unchallenged, that that produced virtually no money. But, Mr. Willis, just a minute. I think that the trial judge, in his ruling, found that the issue was the FCC proves that such gross revenue is a reasonable approximation of defendants' gains from the violations of Section 5. The measure of damages in equitable restitution is not how much the defendant made in net gains. He may have a very heavy overhead and pay great salaries. The question is, how much did the consumers lose less whatever value was retained by them? Let me put the question that was put to counsel for the FTC in a different way. Are you saying now that we should reverse and remand or, pardon me, we should affirm the $191,000, or should we reverse for a new calculation by Judge Proe? And if Judge Proe is to make a new calculation, what are the elements of that calculation? Your Honor, there is no reason, and nothing has been presented to this Court, to overturn the findings and decision of Judge Proe. Yes, there are. He's flat wrong as to how to calculate loss. The loss is not defendants' gain. It's consumers' loss. You know, Your Honor, I think you have to look at what was before him. He had a report from an expert that was actually moved into evidence by the FTC. There was no objection to Dr. Duncan's testimony whatsoever. Well, they say they didn't object because they wanted to attack him and undermine him on cross-examination because they could effectively show that his testimony shouldn't be relied on. And they obviously did not succeed in their goal. The fact that it frequently happens in civil trials that the plaintiff's first witness is the defendant. I mean, it doesn't mean that he's agreeing that the defendant's position was accurate. He just wants to he feels that he can get a lot from putting the defendant on the stand getting admissions or attacking him. Your Honor, I'll be glad to respond to that. I note that the time is up and we have reserved some time for Mr. Homer to speak on behalf of the individual. Go ahead and respond and he'll still have an opportunity. Okay. Thank you. Judge Proh's decision, unless it is illogical, implausible, and without support from the facts, has to stand. Judge Proh evaluated the credibility. No, contrary to law, if he made a legal error. You're quoting from Henson, which I wrote. So the first step is, did he apply the right law? If he applied the right law, is the conclusion illogical, implausible? So the first question is, did he apply the right law of equitable restitution? If he made a mistake on that, there's an abuse of discretion. He did not make a mistake at all because equitable monetary relief requires a causal connection with the Section 5 violation. And the causal connection is how much the consumer lost.   He did not make a mistake at all because equitable monetary relief requires a causal   If he made a mistake on that, there's an abuse of discretion. That's gross sales, less value retained. It is not defendant's gains. Your Honor, I believe that to be true, but I also have to. And that may have been a misstatement by Judge Proh or an inopportune use of terms. But Judge Proh certainly understood the law, which does require the causative connection between the payment and the wrongful act. And I also add that Judge Proh gave the FTC opportunity after opportunity to provide some alternative calculation of equitable monetary relief, up through And the FTC declined his invitation every time he asked. It would be an injustice to send this case back to Judge Proh. And are you opposed to an effort to mediate this case? Certainly not opposed to that, Your Honor, but I'm quite skeptical it would result in any meaningful result given the mediation that we did with the FTC two years  Well, two years is a long time. And, Your Honor, yes, we would certainly participate in good faith in any mediation. Unless there are further questions, thank you. Thank you. We'll just keep running the clock, but you have two or three minutes. Have at it. Good morning, Your Honor. Peter Homer on behalf of the individual defendants. Let me address very quickly a question that Judge Corman asked, which was what happened here. At the conclusion of the government's case, which took place two days, the judge on the record made very clear that he did not buy the government's theory. He said, you have not given me another alternative. The mere fact that I have found that there have been violations, there is no nexus between that and the damages, and I am disinclined to be looking at a $34 million number. At that point, we had a break of, I think, several weeks like this. And I called counsel, trial counsel for the FTC. I had come into the case specifically to try the damages aspects of this case. I wasn't in it for purposes of the summary judgment. And the response from the FTC at that point was, that door is slammed shut. They didn't want to have any conversations at all about inability to pay, the questions which Judge Corman asked for. So what's that a product of? It is FTC dogma. I've litigated these cases with FTC all over the country, and they routinely take this position. In fact, always take the position that it should be disgorgement of gross revenues or if they make a position of net revenues. And the questions which were asked of the FTC's counsel and your inability to get an answer from her today is illustrative of exactly that. They won't back off of the $34 million. Take a look at their brief. Look at the relief that they asked for there. They don't ask you to send it back there, as Judge Corman suggested, for some other alternative way of handling this. They ask for you to say, Judge, you don't have any discretion at the trial court level and remand it with a direction that you enter a verdict for $34 million. That's the FTC's position. Now, I'll jump into this very quickly. Again, since I represent the individuals here, if the Court agrees with the judges or the trial judges' ruling on this, you needn't even reach the issues that pertain to the individuals in this case, because the judgment of $191 million was fully paid. Kennedy, $191,000. $191,000. Pardon me? $191,000, not millions. I'm sorry. Did I say millions? They stipulate for the $191 million. Forgive me. $191. I've got that. You say millions, billions, trillions don't mean too much, right? Unfortunately, with the printing of the money in this country, that may be the case. But that has been paid with interest. And so in that instance, the question as it relates to the individuals has been mooted if you, in fact, agree with them, with what the judge has done. The only thing I would add here that relates to this first threshold issue here is take a look carefully at the opinions where the FTC has been able to prevail, including cases in this circuit where they've been able to prevail and persuade a trial judge to impose as a measure of equitable relief here something as measured by gross revenues. And they always argue that there has to be an abuse of discretion, that it's so far out of the bounds of this. They don't want to talk about that here. And, in fact, the judge very carefully heard this. And if you look at the transcript, repeatedly asked the government to come up with some alternative. He saw that we had come forward with a plausible alternative theory, and the government would not budge. In closing argument, he repeated that and said, are you going to come up with any alternative? Are you going to back off? Didn't he let out most of the individuals? He let out most of the individuals, didn't he? Or am I mistaken? Of the six individuals in the case, he found that two of them were jointly and severally liable, and four of them he found that there was no actual knowledge there which would allow them to impose liability on those individuals. And so in that respect, we certainly are urging this Court to affirm in that respect what they've done. But what if they had knowledge? What's the standard? Is it participation in knowledge, or is it just only knowledge? It is. Participation or ability to control, plus knowledge or just knowledge? It is ability to control plus actual knowledge. Well, didn't Dirk testify that he'd been reviewing Dirk Dentema, reviewing telemarketing scripts and compliance with the law and dealing with consumer complaints since 1985? He had, in fact. But the testimony also was that he had withdrawn from the business entirely, other than serving sort of in his capacity as providing some counseling for his father on certain issues prior to 2004, which was the applicable period. His businesses, he was a court reporter and had nothing to do with it. And what he effectively did was he responded to some complaints. And if there were inquiries from regulators and folks asking investigations, he would gather documents and answer those responses. Frankly, the position and the assertions that they've made here about the case against Dirk was flat-out disingenuous. The brief here is a misrepresentation of the testimony that was on that. And, in fact, if you – it's not on the record, but the judge, I think, was actually upset and frustrated with the FTC's dishonesty about the facts as they led here. As he got into it and he saw this, what they did here was anybody that had the name Dentema was named in this case. Brenda Shang, who I initially represented in this thing, had been – had pulled away from the business, had only been involved in the sales down in the South Florida office, and there was nothing to suggest that linked her office involved with the sales processes that they're talking about. Now, if you're in a position that was expected, Dirk, he may have known what was going on, but he had no control over the – over the enterprise? It is. It is. That is our position. And, in fact, the times in which he looked at those sales scripts occurred years earlier than that. And so there was doubt. But he filed a sworn declaration in which he said that he was familiar with the business operations policies and procedures. I mean – Not questioning that. So he knew. He knew about the – those things in general, but the actual processes that they're talking about here – And he was – he was acting as a consultant, I guess, to his father during the relevant period. But not running the business on a day-to-day basis. He would be called in and deal with things if there was a complaint. So let's be narrow. He knew. Is it your argument – this is really Judge Bea's question – is it your argument as to Dirk that he didn't have control? That's correct. He didn't have control. For each of the others, in 25 words or less, what piece is missing as to their individual liability? One at a time. Okay. With respect to Persis, who was the mother, 80 years old, like that, she was in a totally clerical position, had nothing to do with running the business itself, wrote checks. 25 words or less. Control, knowledge. What piece is missing? Control and knowledge. Okay. Okay. Next. Brenda Shang, there arguably had control, but no knowledge of the kinds of things that they're – that they're complaining about here. Okay. Next. Dirk, no control during that period of time and no specific knowledge of the kinds of sales practices they're complaining about here. Well, that's debatable. But he also – didn't he testify that he continued to receive, even after he left, telemarketing scripts for compliance with the law? I believe he testified. I don't – he did testify that he looked at scripts. I don't recall the temporal link with that. And then the last response is Jeffrey, who was a paraplegic, was – he was involved in the sales process, so the argument there is that he was involved like this, but he was not involved in some of the other aspects of it, which was the calls and things that occurred later on like that. He was on the sales side, just as Brenda was involved with that. So – Had knowledge of what went on in the sales, did not have knowledge as to other aspects, what's your position as to control? I'm sorry? I'm just trying to tick off. We're looking for knowledge and control. Right. He was involved in sales, so presumably had knowledge of what happened in the sales side, which included findings by the district court with regard to the sales tactics. So he had some degree of knowledge. You're saying he was not involved in subsequent stages, so presumably your argument is he does not have knowledge as to subsequent stages. What else is missing? So he didn't have any knowledge of these supposed later verifications, the attempt to shake down consumers, mislead them, and those types of things. And what's your argument with regard to control? Well, with respect to him, he was in a what you would call a management position in supervising that, so I don't think in fairness you can argue that he didn't have the ability to control on that. Thank you. Thank you. I recognize I basically have no time left. Just quickly, on individual liability, there's only one issue here, and that is knowledge. The district court found that all the individuals participated in a pattern and practice of making material misrepresentations and that there were undisputed facts. So the only question, so there's either the first step is control or participation. So Judge Pro found participation. When we get to monetary relief, the question is knowledge. Under this Court's prior precedence, this Court has adopted the AME travel standard from the Seventh Circuit. The question is, was there actual knowledge, or was there reckless disregard for the truth or falsity? And as to each of the defendants, certainly at a minimum there was reckless disregard, but Jeffrey Dantema and Brenda Dantema-Shang, they ran boiler rooms. This is Brenda Dantema-Shang testifying that she was aware that in the initial call to consumers that the representation that this was free was false. That level of involvement in corporate affairs, running a boiler room, hiring and firing telemarketers, pushing them to meet their numbers, has always been held in this Court's prior precedence to give rise to an inference of knowledge of exactly what's going on. How about Persis? Persis? Persis was the President, and I would refer this Court to FTCV Network Depot. As she also, although she did supervise clerical, she wasn't always on the premises. She was authorized to access the check-in count of PBS, and she could also authorize consumer refunds when her son Dries was not there. Did she – did the evidence show that she participated in the dissent of acts or had the authority to control them? No. She – there is no evidence that she actually participated in, but certainly at – she was President, she had – At that point, she still testified in deposition testimony that was admitted, and you didn't cross-examine her at the evidentiary hearing when she said she had no control over the business and principally balanced the checkbook. Well, but she did – it was obvious that she was President of the company. She had access to the check-in account, and under prior precedence, that has always been held to be sufficient to – sufficient evidence of control whether the commission cross-examined her or not. No, it's only relevant because of what she had testified to in the deposition, and they didn't question her about it. Well, it was not subject to dispute what her corporate office was. She also – as a matter of fact, she also – Is this because you have a nominal corporate title that somehow that subjects you to liability? Well, it does – one does assume an obligation. I hate to sound sexist, but – lest I be accused of it, but she was also the wife of the President, and she may have been just going along with this. I mean, I'm giving you a title, you're President of the company. Right. Well, that's reminiscent of the defendant, Ms. Martin, in Network Depot, and the Court held that when you have a corporate office, you also assume some responsibility. You can't just look the other way. She heard – she testified she heard about complaints. She heard talk of complaints. She also sent out – supervised sending out the collection letters. As President, she wasn't entitled to just look the other way. That may have been why they made her President. They didn't want anybody knowing what was going on. I did want to, just in my short time left, the issue that's been raised about mediation and the FTC's intransigence, there is a public interest in having this Court decide this issue. I thought the law was clear. I didn't understand that the law was unclear. It was the application of the law to the facts. And besides, you know, the purpose of cases is not to decide interesting issues. It's to decide interesting issues when there's something of consequence involved. Your Honor, we can't say, sitting here today, that there is nothing of consequence involved. The commission is not – I wasn't – look, I don't want to force you to do anything. I'm not asking you to admit that today. I'm just saying that if it should be, and that could be thrashed out in mediation as well, that they can't afford to pay anything approaching $34 million. It seems to me that reasonable people could reach and find a number that would make sense. But that is a point that the commission – and this is something, Your Honor, that comes up all the time. The commission has not – because it doesn't have an asset freeze here, it doesn't have a handle on the finances. And even in looking at – All of this could be gotten in a mediation proceeding where you say, well, give us this, give us that, and we'll consider it. And they'll say, okay, here is the this and the that, and now let's sit down and see whether we could come to an agreement on the issue. Well, that is usually, from my experience in mediation in the circuit and in the 11th Circuit, that you don't normally get that type of exchange. Usually after a judgment, a matter is referred to our enforcement division, and attorneys who are very skilled in collecting judgments do a thorough investigation. I did have an accountant look at the PBS and Net Profits, and there are a lot of, I would say, red flags here that we would want to investigate. And it's not unusual for a company that's engaged in deceptive practices to show on paper very little in the way of assets because they've been paid out of the corporation. That's something that we have been – If you were willing to stipulate that, we could put it in the order that on remand in an effort to resolve the case, the district judge is authorized to conduct a hearing into the assets of the defendants. Well, and the commission would first want to have a complete discovery, a post-judgment discovery under the Federal rules as we normally do after a judgment. So you want the judgment first? Yes, Your Honor. Well, but that would be the end of the game. You would have a $34 million judgment if that's what we decided to do. You would have, and that would be the end of it. And then our Enforcement Division staff would then proceed with, in the ordinary course, with post-judgment discovery and collection. And this is how, over time – Even with a sequester, you would have plenty of time to engage in this exercise when it's unclear. I can't say – It seems to me to be preposterous to think you're going to collect $34 million here, so you would undertake this effort. We would collect what we have found, and there are – The alternative you face is a decision from this Court that might not come out just the way you want and possibly remand to a district judge who's already reflected some degree of exasperation with the position the commission has taken. So ask yourself at the end of the day, do you prefer that result to the possibility of finding a resolution to the case before a judgment is entered? That's not a question I'm asking you to answer today. It's a question the commission ought to consider, and we'll decide for ourselves what, if any, interim order we'll enter. But anyway, I think we've – We've more than worked you over time. We appreciate your argument. We thank all counsel for your helpful arguments. As we have gone over time, we'll take a 10-minute recess and come back for the argument in the last case on today's calendar. Thank you. Thank you.
judges: Korman, Clifton, Bea